**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NATHANIEL L. ADDERLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 07-507 |
| | ) | Judge Nora Barry Fischer/ |
| C.O. I FERRIER; CO 1 SCHAMP; CO 1 | ) | Chief Magistrate Judge Amy Reynolds Hay |
| JOHNSON; CO 1 BLAKE; LT. FRANK; | ) | |
| SGT MATTHEWS; CO 1 STEPHENS; | ) | |
| CO 1 GAGNON; SGT. AUGUSTINO, | ) | |
| CO 1 WILCHER; LT. YOCUM; CAPT. | ) | |
| BOVO; and CO1 BLAKER; | ) | |
| | ) | |
| Defendants. | ) | Re: Dkt. [90] |

## REPORT AND RECOMMENDATION

I.    Recommendation

It is respectfully recommended that the DOC Defendants' motion for summary judgment, Dkt. [90],  be granted.

II.    Report

This case has been the subject of a prior Report and Recommendation, Dkt. [80], familiarity therewith is presumed.

Nathaniel Adderly ("Plaintiff") has brought a civil rights suit in federal court against multiple defendants who were all employed by the Pennsylvania Department of Corrections at SCI-Greene, where Plaintiff was housed in the Restricted Housing Unit ("RHU") at the time of the alleged incidents giving rise to the present suit.[1]  Plaintiff alleges that various of the

---

[1] Plaintiff has a currently pending federal civil rights suit in the Middle District of

(continued...)

defendants engaged in discrete acts of abuse against him from January 2005 until April 14, 2005. Chief amongst his complaints are two discrete episodes of alleged use of excessive force in extracting Plaintiff from his cell. However, because, based on the video tape evidence of the two cell extractions occurring on February 5, 2005 and on April 7, 2005, no reasonable jury could find for Plaintiff on his excessive force claims, the Defendants are entitled to summary judgment as to those claims. In addition, his claims concerning January 2005 are time barred. In addition, the Defendants are entitled to summary judgement for his claims concerning the conditions of his two strip cell stays in February and April 2005 because those conditions did not violate either his First or Eighth Amendment rights, nor did they deprive him of liberty without procedural due process.

**Relevant Factual and Procedural History**

On March 9, 2007, Plaintiff executed a civil rights complaint against 8 of the Defendants that he has named in the case at hand. Plaintiff filed this civil rights complaint in the Eastern District of Pennsylvania.[2] Adderly v. Ferrier, No. 07-1169 (E.D. Pa.). On March 27, 2007, the Eastern District Court denied the motion to proceed IFP without prejudice to Plaintiff filing the case in the Western District because venue was improper in the Eastern District given that all of the events recounted in the complaint took place at SCI-Greene, which is located within the

---

[1](...continued)
Pennsylvania, wherein he makes remarkably similar claims against numerous RHU guards and others at SCI-Huntingdon. Adderly v. Roddy, No. 3:07-cv-666 (M.D. Pa. Filed 4/10/07).

[2] Plaintiff named in the Eastern District complaint the following eight defendants: C.O.s Ferrier, Schamp, Johnson, Blake, and Stephens, as well as Sergeants Matthews, Augustino and Franks. The Defendants whom were named in the case at hand but not in the Eastern District complaint were: C.O.s Gagnon, Wilcher, and Blaker, as well as Lieutenant Yocum and Captain Bovo.

Western District.  <u>Id</u>., (Dkt. 2).

On April 12, 2007, Plaintiff executed his IFP motion and complaint in the instant case. Dkt. [1] at 1; Dkt. [3] at 4.  On March 7, 2008, Plaintiff filed a "motion requesting permission to relate back," Dkt. [45], which was treated by the Court as a motion for leave to file an amended complaint to include four new defendants, namely, C.O.s Wilcher and Blaker, as well as Lt. Yocum and Captain Bovo.  The Court granted the motion and directed that Plaintiff file an amended complaint to include those four new defendants and allegations against them.  Dkt. [52].  Ultimately, the operative complaint in this case is comprised of the amended complaint, Dkt. [73], which incorporates the Plaintiff's pre-trial statement, Dkt. [64].

Defendants had previously filed a partial motion to dismiss the operative complaint, Dkt. [75], on the grounds that any claim occurring on or prior to April 11, 2005 was time barred.  The undersigned filed a Report recommending that the Defendants' partial motion to dismiss be granted in part and denied in part.  We recommended that the motion to dismiss be granted as to all claims arising prior to March 9, 2005 (the date Plaintiff initiated suit incorrectly in the Eastern District of Pennsylvania) as time barred but denied as to any claims arising on March 9, 2005 and thereafter.  For the first time in his objections to the Report, Plaintiff argued that the statute of limitations should have been tolled while he exhausted his administrative remedies, which he contended did not conclude or were not finally exhausted until September 2005.  Dkt. [81].  The District Court Judge issued a memorandum order which found that based on the limited record, the question of the statute of limitations and equitable tolling could not be decided on the motion to dismiss but specifically permitted the Defendants to file a motion for summary judgment based upon the statute of limitations and providing the necessary factual record for deciding the

3

question.  Dkt. [82].

The Defendants have now filed a motion for summary judgment, Dkt. [90], that complies with the District Court's order and provides evidence, inter alia, of when the administrative remedies were exhausted.  Defendants have also provided evidentiary exhibits, including two DVDs of the two cell extractions.  In addition, the Defendants filed a brief in support of their summary judgment motion, Dkt. [91], as well as a concise statement of material facts, Dkt. [92].  The Court ordered Plaintiff to file his response.  Dkt. [94].  Plaintiff filed his "brief" in opposition, Dkt. [97], a responsive concise statement, Dkt. [97] and a "response" to the Defendants' summary judgment motion, Dkt. [98].

**Standard of Review**

Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden to show or point out why there is no genuine issue of material fact.  Walters ex rel. Walters v. General Motors Corp., 209 F.Supp.2d 481, 484 (W.D. Pa. 2002).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial . . .*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); United States  v. City of Hoboken, 675 F.Supp. 189, 192 (D.N.J. 1987), aff'd, 980 F.3d 724 (3d Cir. 1992)(Table).

The manner of carrying the moving party's initial burden varies, depending on whether the moving party or the non-moving party bears the burden of proof at trial with respect to the

legal issue.  <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993)("The nature of this responsibility varies, however, depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial.").

Instantly, the exhaustion of administrative remedies, one of the affirmative defenses raised by the Moving Defendants, is an issue for which the Moving Defendants would bear the burden of proof.  <u>Ray v. Kertes</u>, 285 F.3d 287, 295 (3d Cir. 2002).  Hence,

> [w]hen the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it "must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." [*Celotex*] at 331 (Brennan, J., dissenting); *see also Chanel, Inc.*, 931 F.2d at 1477. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party. *See id.* at 1477. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, "come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.*; *see also* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting).

<u>U.S. v. Four Parcels of Real Property</u>, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

In contrast,

> [w]hen the nonmoving party has the burden of proof at trial, the moving party is not required to "support its motion with affidavits or other similar material negating the opponent's claim," *Celotex*, 477 U.S. at 323, in order  to discharge this "initial responsibility." Instead, the moving party simply may "'show[ ]'-that is, point[ ] out to the district court –- that there is an absence of evidence to support the nonmoving party's case." *Id*. at 324.  Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. *Id.* at 331 (Brennan, J., dissenting). If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial. Fed.R.Civ.P. 56(e); *Chanel, Inc. v. Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). If the nonmoving party fails to "make a sufficient showing on an

5

> essential element of her case with respect to which she has the burden of proof," *Celotex*, 477 U.S. at 323, the moving party is entitled to summary judgment.

Id., at 1437-38 (footnotes omitted). In either case, regardless of who bears the burden of proof at trial, the moving party must show no genuine dispute over a material fact.

"The substantive law governing the dispute will determine which facts are material, and only disputes over those facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." DeHart v. Horn, 390 F.3d 262, 267 (3d Cir. 2004)(internal quotations omitted). The evidence on summary judgment presents a genuine issue of fact only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The inquiry involves determining whether the evidence pointed to by the parties presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. See Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990)(quoting Anderson, 477 U.S. at 251-52). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50.

In reviewing the summary judgment evidence, the Court has no duty to search the record for triable issues; rather, it need rely only on those portions of the evidentiary record to which the nonmoving party directs its attention. Guarino v. Brookfield Township Trustees, 980 F.2d 399, 404 (6th Cir. 1992).

In short, the summary judgment motion is an evidence testing device to see if there is sufficient evidence to support a party's position with respect to an issue for which that party bears the burden of proof at trial so as to justify holding a trial. Summary judgment "is the . . . moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001).

**Discussion**

The Defendants raised the defense of the statute of limitations.[3] Unlike in their motion to dismiss, there is now evidence of record from which this Court may decide the question of the statute of limitations. The only argument Plaintiff raised in response is that he was entitled to equitable tolling of the statute of limitations during the period of time he was exhausting his administrative remedies. The Defendants provided evidence that as to any incidents which occurred in January 2005, i.e., those claims raised in paragraphs 6 to 8, of Dkt. [64] at pp. 2 to 7, Plaintiff did not file any Grievances under DC-ADM 804. Dkt. [92] at 2, ¶ 8. Thus, Plaintiff was not entitled to any equitable tolling of the statute pending the exhaustion of administrative remedies because he filed no such remedies.

---

[3] The Court of Appeals for the Third Circuit has declared that for Section 1983 actions brought in the Federal courts located within the Commonwealth of Pennsylvania, the appropriate statute of limitations is two years. Fitzgerald v. Larson, 769 F.2d 160, 162 (3d Cir. 1985) ("the two-year Pennsylvania limitation for personal injury actions of 42 Pa.Const.Stat.Ann. § 5524 governs all § 1983 actions brought in Pennsylvania."). Plaintiff brings this action pursuant to Section 1983. Dkt. [64] at 1, ¶ 1. The statute of limitations requires that a complaint be filed between the time the cause of action accrues and the limitation period runs out. The date of accrual of a federal statutory action (when the statute of limitations period begins to run) is a matter of federal law. Albright v. Oliver, 510 U.S. 266, 815 n.6 (1994)(Ginsburg, J. concurring); Keystone Ins. Co. v. Houghton, 863 F.2d 1125, 1127 (3d Cir. 1988)("[d]etermining when a federal cause of action accrues is a matter governed by federal common law."), *overruled on other grounds by*, Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997).

As explained by the Court of Appeals:

> Equitable tolling applies when a plaintiff has "been prevented from filing in a timely manner due to sufficiently inequitable circumstances." *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 240 (3d Cir.1999). This occurs "(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." . . . . The plaintiff, however must "exercise due diligence in preserving his claim." *Irwin*, 498 U.S. at 96, 111 S.Ct. 453. Equitable tolling is an extraordinary remedy which should be extended only sparingly.

Hedges v. U.S., 404 F.3d 744, 751 (3d Cir. 2005) (footnote omitted).   Moreover, "equitable tolling is permitted only if the party has exercised due diligence throughout the period it seeks to have tolled."  Oporto v. Gonzales, 242 Fed.Appx. 756, 758 (2d Cir. 2007); Truxal v. District Attorney of Westmoreland County, No. 08-cv-00934, 2010 WL 411766, at *5 (W.D.Pa. Jan. 28, 2010)("the party seeking equitable tolling must have acted with reasonable diligence throughout the period he seeks to toll.")(quoting Warren v. Garvin, 219 F.3d 111, 113 (2d Cir.2000)). Moreover, it is the Plaintiff's burden to establish entitlement to equitable tolling.  Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 661 (11th Cir. 1993)("Once Buckeye raised the limitations issue, appellants [i.e., Plaintiffs at the District Court level] bore the burden of proving that equitable tolling of the limitations period was appropriate.")(footnote omitted).  See also Harris v. Homecomings Financial Services, Inc./Bank One, __ Fed.App'x __, 2010 WL 1645141, at *3 (3d Cir. 2010)("In order to equitably toll a statute of limitations, a **plaintiff must establish**, in pertinent part, that the defendant actively misled her about her claims or that some other extraordinary circumstance prevented her from pursuing her claims. Moreover, she must demonstrate that she diligently pursued her claims.")(emphasis added)(citations omitted);  Carter

8

v. Keystone, __ Fed.App'x __, 2010 WL 104521, at *1 (3d Cir. 2010)("Plaintiff bears the burden to show that equitable tolling is warranted."). We have already extended equitable tolling for the third reason given in Hedges, namely, for Plaintiff's filing of a complaint in the Eastern District on March 9, 2005 (erroneously raising a substantial number of claims therein which he now raises herein).[4] However, Plaintiff contends for even more equitable tolling based upon the time during which he pursued administrative remedies.

Even though Plaintiff contends for more equitable tolling so as to toll the statute of limitations from January 2005,[5] he has failed to carry his burden to show entitlement to any more equitable tolling. In response to the evidence that Plaintiff filed no grievances under DC-ADM 804 regarding his January claims, Plaintiff afforded no evidence that he did file any such grievances. He did however contend that he exhausted his administrative remedies by utilizing other provisions of DOC policy. Dkt. [97] at 2 to 3, ¶¶ 7-8. Namely, he contends that he utilized the provisions governing "emergency" situations, which allegedly instructed Plaintiff to "speak to the nearest staff (member) person as soon as possible" or alternatively by using the method of first trying to resolve the complaint informally by speaking or writing to staff using a DC-135 Inmate Request to Staff. Id. The problem with this is that Plaintiff fails to say when he began to utilize these methods or when they were completed, if, in fact, he did use these methods and what the results of these methods were, as is his burden to show entitlement to equitable tolling.

---

[4] It is arguable whether Plaintiff's claims that were not raised in the Eastern District complaint but were subsequently raised herein should be equitably tolled but the parties do not raise this issue and we do not reach it.

[5] Plaintiff does not specify a date in January 2005, when the alleged violations began and so when in January his cause(s) of action specifically accrued. See, e.g., Dkt. [64] at 2, ¶ 6.

As to using the Inmate Request system/form, again Plaintiff has failed to show under the Administrative Remedies available to him at DOC that mere verbal requests or even a written request to staff fully exhausted his administrative remedies as would be his burden to show entitlement to equitable tolling.  See, e.g., Harvey v. Brown, Civil No. 06-1891, 2010 WL 338052, at *2 (D.N.J., Jan. 25, 2010) wherein the Court cogently explained as follows:

> Plaintiff did not pursue a formal grievance to complain that he had been housed, intentionally, with a dangerous cellmate. (Pl.'s Resp. Stat. Mat. Fcts. ¶¶ 21-24.) Plaintiff nonetheless argues that his informal complaints to corrections officers satisfy the exhaustion requirement, because the informal complaints were ultimately successful: Plaintiff requested that he be transferred to a different cell, and ultimately he was so transferred.
> Procedural exhaustion demands more, however. First, "[i]t is clear that for the exhaustion requirement to be satisfied, the inmate must utilize all available procedures for review under the prison's grievance system." *Michael B. Mushlin, Rights of Prisoners* § 17:22 at 615 (4th ed.2009) (emphasis added) (*citing, inter alia, Neal v. Goord*, 267 F.3d 116, 122 (2d Cir.2001) . . .  A prisoner does not satisfy the exhaustion requirement by complaining verbally in lieu of bringing a formal grievance under a prison's established grievance procedure.

Furthermore, he fails to provide evidence as to when he initiated this process or when it was completed or what the result was.  Accordingly, he has failed to show entitlement to equitable tolling, as is his burden.

Lastly, Plaintiff invokes yet one more method by which he claims to have exhausted administrative remedies, namely, DOC-ADM 001, wherein prisoners may report abuse of inmates.  However, again, Plaintiff provides no evidence of when he began to use this method, when this method was completed, if it were completed, or what the result of this method was. In light of the foregoing, we find that Plaintiff has failed to carry his burden to show that there is a genuine issue of material fact regarding whether he was entitled to equitable tolling for the period of time he was allegedly exhausting administrative remedies.  Hence, we find that all

claims regarding the January 2005 incidences are time barred (or more precisely, there is no genuine factual dispute over this) and so, the Defendants are entitled to summary judgment for these claims.

Next, the Defendants assert that, based upon the foregoing reasoning, Plaintiff's claims regarding the February 5, 2005 alleged excessive force incident are also time barred because the exhaustion process as to these claims was completed on April 8, 2005 and Plaintiff did not file the current suit until April 12, 2007. Dkt. [92] at 3, ¶ 17; Dkt. [91] at 10 ("Moreover, the grievance that Plaintiff filed regarding the alleged excessive use of force on February 5, 2005 was fully exhausted on April 8, 2005, meaning that, arguably, these claims too should be time barred (See Exhibit 3 [i.e., Grievance No. 109921])"). We disagree on two grounds.

First, the Defendants base their argument on the fact that Plaintiff's Grievance No. 109921, was completely exhausted as of April 8, 2005 but they mistakenly contend that this grievance concerned primarily the excessive force allegedly used on February 5, 2005. Dkt. [92] at 3, ¶ 17. Indeed, the claims contained in Grievance No. 109921 primarily concern the conditions of Plaintiff's confinement in a strip cell after the cell extraction of February 5, 2005. See Dkt. [90-1] at 19 (Grievance No. 109921) & 21(grievance response) (both of which concern Plaintiff being in the strip cell and being denied property, legal work, mail, clothes, shoes and washcloths as well as law library access for five days after February 5, 2005).[6] Hence, Defendants have not shown that the excessive force claim, as opposed to the claim concerning the conditions of Plaintiff's confinement for five days after the February 5, 2005 cell extraction,

_____

[6] It is Grievance No. 109870 that concerns Plaintiff's claims of alleged excessive force on February 5, 2005. Dkt. [90-1] at 4 & 7.

is time barred.

The second ground upon which we disagree with the Defendants is as follows.  Even if we considered the Defendants' argument to be that those claims actually contained in Grievance No. 109921 (and not the excessive force claim) are time barred, we would still not be persuaded. Plaintiff's claims regarding the denial of his property and mail and law library access, (i.e., the claims actually contained in Grievance No. 109921) accrued as of February 5 to February 10, 2005, which is the time span he was kept in the strip cell.  We take those claims in Grievance No. 109921 to be those claims Plaintiff raises in his complaint contained in Dkt. [64] at 13 to 15, ¶ 13.  Hence, Plaintiff was required (absent equitable tolling) to file the instant suit within two years following those events i.e., February 5, 2007 to February 10, 2007.  However, Defendants themselves have shown that Plaintiff's administrative remedies with respect to the February 5 to February 10, 2005 claims were not completed until April 8, 2005.  Hence, pursuant to Plaintiff's argument for equitable tolling, which the Court accepts, the statute of limitations would have been equitably tolled from the time Plaintiff's claims accrued, i.e., February 5, 2005, etc. until April 8, 2005, when the administrative remedies concerning those claims were exhausted.  Thus, the statute of limitations as to those claims would not have begun running until April 8, 2005 with the statute of limitations then running out on April 8, 2007, absent any additional equitable tolling.   Although Plaintiff is not deemed to have filed the present lawsuit in this court until April 12, 2007 (i.e., the date he signed the complaint under the prisoner mail box rule)  and thus ostensibly four days beyond April 8, 2009, i.e., the date that the two year statute of limitations period would have run out, we must recall that Plaintiff was entitled to a second period of equitable tolling. Plaintiff would have been entitled to the second period of equitable tolling from

March 9, 2007 (i.e., the date he erroneously filed his complaint in the Eastern District) until April 12, 2007, the date he is deemed to have filed the complaint in this court.   Given this period of additional tolling, Plaintiff's filing of the complaint on April 12, 2007, during a time when the Statute of Limitations had stopped running as of March 9, 2007, renders the complaint timely as to these claims accruing from February 5, 2005 to February 10, 2005.   Hence, Defendants have failed to show entitlement to summary judgment as to these claims based upon untimeliness.

While we recommend not granting the motion for summary judgment based upon the untimeliness ground as to these claims, we nevertheless recommend the grant of summary judgment as to the claims from February 5th to February 10th or 12th concerning the conditions of the strip cell on the Defendants' alternative ground that such claims fail to state a claim.   Dkt. [91] at 24 to 25.   We find that the allegations of denial of property, clothes, toiletries, legal mail, pillow, mattress, and denial of access to the law library and showers for a period of five days as indicated in the grievance or even for seven days as suggested in the complaint, Dkt. [64] at 17, ¶ 15,  fails to state a claim as a matter of law.   To the extent that Plaintiff is attempting to make out an Eighth Amendment claim[7], we find under the circumstances of this case, Plaintiff fails to state an Eighth Amendment claim given the legitimate penological interests served by placing a non compliant, belligerent inmate, (who is already in the Restricted Housing Unit, the least privileged housing unit in the prison), in a strip cell and so neither the objective nor subjective component of an Eighth Amendment conditions of confinement claim is made out.   See, e.g., O'Leary v.

---

[7]   Wilson v. Seiter, 501 U.S. 294, 298 (1991)(explaining that analysis of a violation of the Eighth Amendment involves a two pronged inquiry: (1) an objective inquiry into the qualitative nature of the harm suffered by the victim of the alleged punishment and (2) a "subjective inquiry" into the mind of the person inflicting the harm).

Iowa State Men's Reformatory, 79 F.3d 82, 84 (8th Cir. 1996) (placement of inmate in strip cell for 6 ½ days as part of a disruptive inmate policy did not violate Eighth Amendment); Williams v. Delo, 49 F.3d 442, 444-46 (8th Cir. 1995) (placement in strip cell without water, mattress, a tooth brush, tooth paste, deodorant, soap, sheets, blankets, pillow cases, pillows, his legal mail and/or clothing, for four days did not violate Eighth Amendment); Smith v. McCleod, 946 F.2d 417 (5th Cir. 1991) (dismissing as frivolous an appeal from a District Court order dismissing as frivolous a complaint alleging "a seven-day detention in a 'strip cell' because of an altercation with another prisoner"); Norman v. Hubert, No. 07-387, 2009 WL 981100, at * 2 (M.D.La., March 18, 2009)(finding no Eighth Amendment violation where prisoners who are placed in "Restrictive Cell Status" are "required to wear spit masks whenever they are out of their cells and are not allowed to enjoy telephone privileges, visitation privileges, or outdoor exercise. In addition, inmates are deprived of their personal property, personal clothing, religious items, bedding and hygienic supplies. Finally, inmates housed on Restrictive Cell Status are required to wear a paper gown, and if they damage this gown, are required to miss scheduled meals."); Guinn v. Rispoli, No. 06-075, 2008 WL 4224576, at *3 (D.Del. Sept. 16, 2008) (finding no Eighth Amendment violation where the prisoner-plaintiff was housed in isolation, under strip cell conditions, for fourteen days without sheets or blankets and only wearing his boxers), aff'd, 323 Fed.Appx. 105 (3d Cir. 2009); Breer v. Gold, No. 2:03-CV-326, 2009 WL 249648, at *6 (D.Vt. Feb. 3, 2009)("Breer's complaint cites the conditions of his strip cell status, including the lack of a mattress, blanket, personal care items and writing materials. The lights were allegedly kept on 24 hours a day, and he was not allowed legal or personal mail. Even assuming the truth of these allegations, however, the conditions of his confinement did not rise to the level of an Eighth

14

Amendment violation."); <u>Abascal v. Hilton</u>, NO. 9:04CV1401, 2008 WL 268366, at *12

(N.D.N.Y. Jan.30, 2008) (five days in strip cell did not violate Eighth Amendment where

plaintiff did not allege deprivation of "the minimal civilized measure of life's necessities"), *aff'd*,

357 Fed.Appx. 388 (2d Cir. 2009); <u>Jackson v. Lencovich</u>,  No. 05-CV-930, 2008 WL 2697315,

at *3 (M.D.Pa., July 3, 2008) (addressing placement in strip cell for 7 days: "In this regard,

Plaintiff's Amended Complaint does not allege that he was deprived of life's basic necessities,

such as food and water, or that he sustained some injury, other than discomfort, as a result of his

temporary placement in the strip cell. Plaintiff's claim that it was unlawful to deprive him of

items such as toothpaste, toothbrush and deodorant because the disruptive behavior that landed

him in the strip cell did not entail the misuse of those items fails because those items, though

important, do not comprise basic life necessities. Moreover, the Amended Complaint shows that

there was a legitimate penological purpose in confining Plaintiff in the strip cell. Specifically,

placing paper over the cell door window constituted a significant security risk that was not

amenable to resolution by ordinary disciplinary proceedings."); <u>Lock v. Clark</u>, 90-CV-0327,

1992 WL 559660, at *9 (N.D.Ind. March 17, 1992) ("The deprivations alleged by Mr. Lock in

this case [which consisted of being confined for seven days in a 'strip cell' in a segregation unit,

deprived of all personal property, including soap and hygienic items] fail to satisfy the objective

component of his Eighth Amendment conditions claim, and they do not rise to the level of a

constitutional violation."); <u>Winn v. Delaware</u>, No. Civ. A. 02-34, 2003 WL 22415872, at *3 (D.

Del. 2003) ("placing [inmate] on strip cell status as a result of his disruptive behavior is

reasonably related to further the legitimate penological interest in institutional security").

 The foregoing analysis applies with equal force to Plaintiff's complaints about the strip

cell he found himself in after the April 7, 2005 cell extraction.  The only significant difference is that Plaintiff claims that he was not provided several meals while housed therein during the period of April 7, 2005 to April 14, 2005.  Plaintiff does not specify which days he was denied meals or the consecutive length of time he was denied meals in his complaint.  However, in his near contemporaneous grievance, Plaintiff explained that

> For seven days I was denied breakfast and lunch trays by C/O Schamp on FB Pod. When I complained about it, he said "you shouldn't be in that cell I always burn [i.e, deny] people in that cell[.]" This continued by him for four consecutive days. Then on the fifth day C/O Johnson denied me trays saying"If you got a problem with him, you got one from me."  The following two days C/O Blake denied me trays and said "Stop complaining about us burning you for trays and we'll stop."

Dkt. [90-1] at 40.  In his appeal, Plaintiff explained that "I was not fed meals by Fb block 6 - 2 [i.e., 6 AM to 2 PM] shift officers Schamp, Blake and Johnson for seven consecutive days."  Dkt. [90-1] at 45.   Hence, it is clear that by Plaintiff's own implicit admission, he was receiving dinners during that seven day time frame.

Moreover, in contrast to Plaintiff's allegations, the Defendants have provided documentary evidence in the form of a DC-17X form which documents an inmate's daily routine and activities.  That evidence shows Plaintiff refused breakfast and lunch on April 10, 2005 but accepted dinner on that date, refused all three meals on April 11 and refused breakfast on April 12, but accepted lunch.  On April 13, 2005, Plaintiff was denied breakfast and lunch because he refused to step back away from the wicket as required by procedures but that Plaintiff was fed his dinner.  It does not appear that Plaintiff specifically denies refusing food during this period, Dkt. [97] at 18, ¶¶ 104 & 109.

Even accepting as true that for seven consecutive days Plaintiff was denied breakfast and

lunch, we do not find that Plaintiff has sustained his burden to show a sufficiently serious

deprivation in the absence of showing that the dinners, which were undeniably provided to him,

did not satisfy some minimum daily quantum of calories which was adequate for health, as

would be his burden to show an objectively serious deprivation.  See, e.g., Harris v. Look, CIV

S-07-1244, 2008 WL 2488970, at *2 (E.D.Cal. June 16, 2008)("The Sixth Circuit has found that

feeding inmates only once a day for 15 days would constitute cruel and unusual punishment **only**

**if** it "deprive[s] the prisoners ... of sufficient food to maintain normal health.")(citing,

Cunningham v. Jones, 567 F.2d 653, 669 (6th Cir. 1977), *app. after remand*, 667 F.2d 565

(1982)).  In the absence of any competent evidence that Plaintiff's health was adversely affected

by the provision of only one meal a day, Plaintiff has not carried his burden to show a sufficiently

objective denial on this record.   In other words, mere hunger is not sufficient to show an Eighth

Amendment violation, there must be a denial of adequate nutrition and absent evidence

concerning the nutritional value of the one meal a day which he did undoubtedly receive during

this seven day period, Plaintiff cannot sustain his burden to show an Eighth Amendment

violation.

Even if we assume without deciding, that being denied breakfast and lunch for seven

consecutive days satisfies the objective prong, there is no evidence provided by Plaintiff to

satisfy the subjective prong, i.e., that any of the Defendants knew at the time of the alleged

denials of breakfast and lunch for seven consecutive days, that such posed a substantial risk of

serious harm, given the undeniable provision of dinners to Plaintiff.   Hence, the Defendants

would be entitled to summary judgment as to this claim.[8]

To the extent that Plaintiff claims a First amendment denial of access to courts based upon a five day or even seven day delay in receipt of legal mail or in the sending of legal mail, while he was housed in the strip cell in February 2005, and/or while housed in the strip cell in April 2005, he has alleged no injury to a suit.  Toussaint v. Good, 276 Fed.Appx. 122, 124 (3d Cir. 2008)("As to Toussaint's First Amendment claim regarding the denial of access to the courts, we agree with the Magistrate Judge's determination that Toussaint alleged no actual injury under *Lewis v. Casey*, 518 U.S. 343, 355 (1996).").   To the extent that Plaintiff is making a First Amendment free speech claim about either the legal mail or personal correspondence, we find that restrictions on such privileges in a strip cell following the type of behavior exhibited by Plaintiff in the DVDs satisfies the Turner reasonableness test as a matter of law.[9]

---

[8]  Plaintiff makes one additional claim regarding the strip cell conditions in April 2005. Plaintiff claims that the "cell walls were covered with a brown substance, that resembled feces." Dkt. [90-2] at 3 (Plaintiff's grievance filed at that time he was housed therein).  However, the DVD recording of the April 7, cell extraction shows no such brown matter existing in the cell in which Plaintiff was placed following the extraction.  DVD at 27:26 to 30:29.  Nor does Plaintiff complain to the cameraman who continues to video tape Plaintiff for at least three minutes after he has been placed in the cell.  Id.  Hence, there is evidence lacking of the objective prong.  Nor does Plaintiff show that the Defendants have the requisite subjective mindset to satisfy an Eighth Amendment claim because his claims of feces on the walls were investigated by a non-party DOC employee who found the claim to be unfounded.  Hence, there is no evidence that the Defendants possessed the subjective mindset necessary to make out the Eighth Amendment conditions of confinement claim. Relying on an investigator to confirm or deny Plaintiff's allegations and then choosing to believe the non party investigator's findings over that of the Plaintiff's allegations simply does not meet the subjective prong of an Eighth Amendment claim.  In other words, there is no constitutional requirement that the Defendants themselves personally investigate Plaintiff's allegations or believe Plaintiff's allegations over the results of the investigation by a DOC employee.

[9]  Turner v. Safely, 482 U.S. 78 (1987). In Turner, the Court listed four factors governing the review of prison regulations or actions:  (i) whether there is a valid, rational connection between the prison regulation/action  and the legitimate governmental interest put forward to

(continued...)

18

To the extent that Plaintiff claims he was denied liberty without due process for either period of being housed in the strip cells, we find that he has not sufficiently alleged a deprivation of a liberty interest with such a brief stay of five or seven days in the case of the February 2005 stay, or for the seven days in the case of the April 2005 stay. See, e.g., Mosley v. Bishop, No. 07-0692, 2009 WL 1564778 at *7 (S.D.Ala., June 1, 2009)("Plaintiff has alleged that he was denied his mattress, bedding, clothing except for boxer shorts, toothpaste, a toothbrush, and daily exercise for a period of nine days. . . . Plaintiff has not alleged that he was denied adequate food or medical care, or sufficiently shown the denial of a basic human need, nor has he alleged any other circumstance that, in the Court's view, would constitute an atypical and significant hardship in relation to the ordinary incidents of prison life. Therefore, Plaintiff did not possess a liberty interest in being free from the alleged conditions of his temporary stripped cell confinement.").

Alternatively, even if Plaintiff had been deprived of a liberty interest, such was not accomplished without procedural protections. Plaintiff himself notes that he was given a misconduct and provided a hearing shortly after his placement in the strip cell for the February 2005 incident, Dkt. [64] at 15 to 15, ¶¶ 14 to 15, and found guilty of most but not all of the misconduct charges. Hence, we find this post deprivation process sufficient to satisfy the requirements of procedural due process, even assuming that placement in the strip cell for five days constituted the deprivation of a liberty interest. See, e.g., Hasan Jamal Abdul Majid v.

---

[9](...continued)
justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities. Turner, 482 U.S. at 89-90.

Henderson, 533 F.Supp. 1257, 1272 (D.C.N.Y. 1982)("Principles of due process would seem to require that Superintendent's Proceedings [i.e., disciplinary hearing] be commenced as soon as is reasonably practicable following the inmate's initial confinement in SHU [i.e., Special Housing Unit], and, in no event, be commenced beyond seven days of confinement without authorization of the Commissioner."), aff'd, 714 F.2d 115 (2d Cir.1982).  Plaintiff also admits that he was given a misconduct for the April 7, 2005 cell extraction incident.  Dkt. [64] at 38.  Plaintiff was found guilty of those misconduct charges. Dkt. [90-4] at 70 to 72.  Thus, the foregoing reasoning applies equally to his strip cell stay in April 2005.   Hence, we find that those claims raised in Grievance No. 109221 (concerning the February 2005 strip cell stay) and which are also raised in Plaintiff's complaint, Dkt. [64] at 14, fail to state a claim upon which relief can be granted, just as those claims raised in Grievance No. 115485 (concerning the April 2005 strip cell stay), Dkt. [90-1] at 29 to 38, to the extent that they are also raised in Plaintiff's complaint, fail to state a claim upon which relief can be granted.

In the alternative as to the claims of the strip cell stay in February, we find that Plaintiff has procedurally defaulted any of his claims raised in Grievance No. 109221 because he failed to name anybody in the grievance.  Thus, he failed to name in the grievance any of the defendants that he has now named in this lawsuit.  As the Defendants point out in their brief, "the failure to name responsible individuals in grievances constitutes a failure to exhaust and a concomitant procedural default."  Dkt. [91] at 12 (quoting Goodley v. Superintendent of SCI Greene, No. 08-1290, 2009 WL 2855702, at *5 n.6 (W.D. Pa. Sept. 2, 2009)).  The only response Plaintiff makes is his invocation of Jones v. Bock, 549 U.S. 199 (2007) for the proposition that he need not have named individuals in his grievance in order to name them as defendants in his lawsuit.

Dkt. [97] at 25.  However, for the reasons stated in Buehl v. Beard, Civ. A.  No. 03-1313, 2007

WL 1830616  (W.D.Pa. June 25, 2007) and Watts v. Tretinik, No. 07-824 , 2008 WL 4279808

(W.D.Pa. Sept. 16, 2008),  aff'd, __ Fed.App'x __, 2010 WL 438443, at * (3d Cir. 2010), the

Supreme Court decision in Jones v. Bock, which held that the Michigan Department of

Corrections rules, governing inmate grievances, did not require that the prisoner name

individuals whom he eventually sued, is distinguishable from the present case because the Third

Circuit Court of Appeals already has held in Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004) that

the Pennsylvania Department of Corrections rules, governing inmate grievances, do require the

naming of such.  The Jones court specifically contemplated that this would be the case, i.e.,

various states' rules would yield various outcomes. Jones, 127 S.Ct. at 923 ("The level of detail

necessary in a grievance to comply with the grievance procedures will vary from system to

system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the

boundaries of proper exhaustion. As the MDOC's procedures make no mention of naming

particular officials, the Sixth Circuit's rule imposing such a prerequisite to proper exhaustion is

unwarranted.").  Hence, Plaintiff procedurally defaulted all of his claims raised in Grievance No.

109921  against all of the defendants by failing to name any of them in the grievance.  Watts v.

Herbik, __ Fed.App'x __, 2010 WL 438443, at *1  (3d Cir. 2010)("As an initial matter, we agree

with the District Court's dismissal of Watts's § 1983 claim against defendant Tretinik. The PLRA

requires that a prisoner exhaust any available administrative remedies before bringing a federal

claim concerning prison conditions. This requirement includes a procedural default component.

Per institutional policy, inmates must exhaust administrative remedies and 'identify any persons

who may have information that could be helpful in resolving the grievance.' Id. at 234 (citing

Pennsylvania's Department of Corrections policy). As Watts failed to mention Tretinik in his administrative grievance and did not place him on notice of alleged wrongdoing, Watts procedurally defaulted all claims against him.")(some citations omitted).

In the alternative, as to the claims concerning the February 2005 strip cell stay, Plaintiff procedurally defaulted all of his claims in Grievance No. 109221 because he failed to follow proper procedures when he failed to provide to the Secretary's Office of Inmate Appeals and Grievances ("SOIGA") (i.e., third stage of the grievance process) copies of the first stage grievance and response and the second stage appeal and response. See Dkt. [90-1] at 26 (letter informing Plaintiff of requirement to provide photocopies of lower grievance and appeal papers and giving him 10 days in which to rectify the deficiency) and at 27 (letter from third level Office of Inmate Appeals indicating no action will be taken because Plaintiff failed to rectify deficiency). See, e.g., Eakle v. Palakovich, No. 4:CV-0-0007, 2006 WL 709562, at *5 (M.D.Pa., March 21, 2006)("In applying the above analysis to the factual background surrounding this action, it is readily apparent to the Court that Plaintiff has procedurally defaulted on his claims and summary judgment will be granted in favor of Defendants. Plaintiff's appeal to the Secretary's Office of Inmate Grievance and Appeals was rejected because it failed to comply with DC-ADM 804, VI., D., 1h; specifically, it did not include copies of plaintiff's initial grievance and his appeal to the Superintendent. (Rec.Doc. 38, Ex. G). The record discloses that Eakle failed to resubmit the required documentation relative to his appeal. Id. Thus, Eakle has sustained a procedural default under the applicable DOC regulations."). See also Green v. Ringwood, No. 2:09CV00070, 2010 WL 1052871, at * 2 (E.D.Ark., March 5, 2010)(same).

Accordingly, for any or all of the foregoing reasons, Plaintiff's claims contained in

Grievance No. 109921, which mirror Plaintiff's claims contained in his complaint should be dismissed for failure to state a claim as should his claims concerning the April 2005 stay in the strip cell (however, although the denial of food claims in April 2005 may state a claim upon which relief can be granted, we have found that the Defendants are entitled to summary judgment on such claims, given that Plaintiff failed to carry his burden to show the one meal a day that he was provided failed to provide him adequate nutrition).

Next, we take up Plaintiff's claims of excessive force which allegedly occurred leading up to and including the extraction of Plaintiff from his cell on February 5, 2005. The landmark Supreme Court case in the Eighth Amendment excessive force area is Hudson v. McMillian, 503 U.S. 1 (1992). The Court held that "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 6-7.[10]

Plaintiff admittedly had placed a covering over the windows of his cell. Dkt. [64] at 7,

---

[10]  In addition

Under the *Whitley* approach, the extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.' 475 U.S. at 321. In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and "any efforts made to temper the severity of a forceful response." *Ibid.* The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it."

Hudson, 503 U.S. at 7.

¶9.   Reportedly, Plaintiff had done so because he was preparing himself for a bowel movement and "part of this preparation included fashioning a privacy screen (partial privacy screen so that inmates in cells across from Plaintiff's could not view Plaintiff during this momentary private personal moment.  (Note: the span of the cell door windows spans approximately between 30% - 35% of the cell door with a view [o]f Plaintiff while inside of the cell defecating or otherwise to othe[r] inmates.)".  Id.   Plaintiff covered the windows of his cell, notwithstanding that this is against the prison rules.  Plaintiff claims that the Officers view of Plaintiff was unobstructed.  Id.

In support of their summary judgment motion, Defendants provided a video tape of the extraction including the gathering of the extraction team outside of the POD, and their entering the POD.  This video tape establishes that Plaintiff's asserted motives in covering the windows of his cell are untrue.  The POD is a very large triangular shaped room with the entrance opposite the point of the triangle and cells along the two sides of the triangle to the left and right of the entrance and on two tiers.  Plaintiff's cell was on the second tier and close to the wall where the entrance door was or, in other words, close to the widest part of the triangular room.  Given the position of Plaintiff's cell, it would have nearly been impossible for an inmate across the room to have seen in Plaintiff's cell door windows.   Even if it were otherwise, it is undisputed that there were methods of obtaining privacy, such as holding up a towel or sheet in front of oneself while one is on the commode, rather than blocking the cell window, which poses a security threat.

Viewing the videotape conclusively establishes the facts as described by the Defendants in their statement of facts and brief.  Namely, Plaintiff was given numerous orders to remove the obstruction from the window and to place his hands out the wicket to be cuffed up and that as a consequence of Plaintiff's choices and actions, the Defendants had no choice but to extract

24

Plaintiff from the cell using only such force as was necessary to accomplish the task. Upon arrival at Plaintiff's cell door, the DVD clearly shows Plaintiff had covered his head with a cloth and placed pieces of cloth in his nose, clearly anticipating that OC spray would be used and his intent to thwart the use of such. Although Plaintiff claims in his complaint that he verbally said he would comply with the orders to remove the obstruction from the window and cuff up, the tape shows that he constantly asked for what reason he had to do so and the tape further shows that he failed to actually comply with the orders. In addition, the tape clearly records Plaintiff saying he would only conditionally comply. Specifically, at point 6:51 to 6:58 minutes into the tape, Plaintiff can be heard clearly saying, "I want off of this block. If I can get off of this block, [and if I can] stopped being harassed, I'll comply with your orders. Until then, I am not doing anything."

Even viewing the tape in a light most favorable to Plaintiff, no reasonable jury could find for Plaintiff that excessive force was used in the use of the OC, or in the use of force to extract Plaintiff or in the subsequent removal of Plaintiff's clothes by cutting them off of him after having him lie prone on the floor in order to conduct a strip search of Plaintiff for the purpose of security, assuring that the inmate did not hide any weapons on or in his person as he prepared for the self created confrontation.

This is so, notwithstanding the fact that Plaintiff claims there were rapid blows to his body upon the extraction team's entrance into the cell. The tape does not show such, although there is some difficulty in seeing, given that the extraction team pretty much covered the view of Plaintiff. Nevertheless, the medical evidence shows that Plaintiff was not so struck as Plaintiff now claims. A nurse accompanied the extraction team and after the strip search was completed,

the Lt. asked Plaintiff if he needed medical attention. DVD at 17:44. The nurse asked Plaintiff some questions and he can be heard to say that his nose and his eyes are bothering him and so the nurse offered to wash his eyes out with saline and she did so. Plaintiff can also be heard to say the cuffs on the bottom of his legs are too tight, so the nurse also checked the inmates cuffs on his ankles. Thereafter she wrote up a report. That report stated as follows: "No injury noted to eyes, nose ribs or ankles @ this time." Dkt. [90-2] at 55. On the report, under a heading of "Type of Injury" with spaces for laceration, hematoma, abrasion, burn, non apparent or other, the only box checked was other and the Nurse specified "tearing eyes." Id. The report further noted under the heading "Treatment Rendered" the following: "Assessed. Eyes flushed out [with] sterile eye wash, ankle cuffs checked for circulation – within-in normal limits. No further treatment needed. Pictures obtained of face . . ." Id. For follow up, Plaintiff was placed on sick call for February 7, 2005. All of the evidence considered, including the DVD and the medical records simply do not support the claim that Defendants "[l]and[ed] rapid heavy . . . blows to various parts of Plaintiff's body which included the head, face, back inter alia, blows which were devastating due to Plaintiff's face down position on the floor each blow caused excruciating pain since the hard unyielding floor had no give and the impact was thrice as devastating . . . Each punch to the face and head brought flashes of light and immense pain as Plaintiff was beaten in and out of consciousness." Dkt. [64] at 11 to 12. Hence, on this record no reasonable jury could find for the Plaintiff on his excessive force claims or otherwise on any other claim. See, e.g., Scott v. Harris, 550 U.S. 372, 380 (2007)(in which the Court found that when ruling on a summary judgment motion and when a party's version of the events "is blatantly contradicted by the record," such as by a video of the incident as was had there and as is had here, the lower court

should have "viewed the facts in the light depicted by the videotape.")  Id. at 381.  See also

Stewart v. Prince Georges County, 75 Fed.Appx. 198 (4th Cir. 2003)(Videotaped footage

confirmed enough of police officers' testimony, and destroyed enough of supposed eyewitnesses'

version, to establish that the officers did not use excessive force against a department store

patron, in § 1983 action alleging Fourth Amendment violation; videotape, marked by an

uninterrupted clock time stamp, plainly contradicted eyewitnesses' assertion, and no reasonable

juror could have credited the testimony of those witnesses);  Mediaceja v. Horner, 82 Fed.Appx.

488 (7th Cir. 2003)(prisoner was not prejudiced by denial of appointment of counsel, where no

attorney could have overcome negative impact of surveillance videotape on prisoner's claim that

he was the victim of excessive force when guards forcibly removed him from his cell; videotape

fully supported guards' contention that they used only the force necessary to control the

situation).

        To the extent that Plaintiff claims the force used was retaliation, the same evidence,

showing no Eighth Amendment violation, also shows a legitimate penological interest in the use

of the extraction team and the necessity of the use of force as evidenced by this record.   Rauser

v. Horn, 241 F.3d 330, 334 (3d Cir. 2001) ("This means that, once a prisoner demonstrates that

his exercise of a constitutional right was a substantial or motivating factor in the challenged

decision, the prison officials may still prevail by proving that they would have made the same

decision absent the protected conduct for reasons reasonably related to a legitimate penological

interest."); Iseley v. Dragovich, 90 Fed.Appx. 577, 581 (3d Cir. 2004) (upholding summary

judgment, the Court held that "[a]ssuming arguendo that Iseley met his initial burden under

Rauser regarding the retaliatory denial of medical care, for all of the reasons set forth above and

in the District Court's opinion, the defendants have shown that they would have arrived at the same decision regarding appropriate treatment for Iseley's dental problems, his nearsightedness, and for Hepatitis C condition in 1999, 2000 and 2001."); Carter v. McGrady, 292 F.3d 152, 153 (3d Cir. 2002) ("We conclude, assuming *arguendo* that Carter has correctly described the attitude at SCI-Mahanoy about jailhouse lawyering and that he has made out a *prima facie* case of retaliation, that there is no genuine issue of material fact that the prison officials would have disciplined Carter for these violations notwithstanding his jailhouse lawyering."). Hence, the Defendants are entitled to summary judgment as to all of Plaintiff's claims contained in the complaint found at Dkt. [64] at 7, ¶ 9 to p. 15, ¶ 14.

Likewise, Defendants' motion for summary judgment should be granted as to Plaintiff's claims concerning the allegedly excessive use of force on April 7, 2005. In support of their motion for summary judgment, the Defendants proffered a DVD of the extraction of Plaintiff from his cell when he again refused orders to be handcuffed to be moved to a different cell. Just as in the February 5, 2005 incident, Plaintiff again had barricaded his door and covered his face in an attempt to thwart the effects of the OC. This time however, after use of OC, Plaintiff agreed to put his hands out the wicket and be handcuffed. DVD at 12:30. The cell door was opened and Plaintiff was placed prone on the ground, leg shackles were applied as was a spit shield and Plaintiff was then escorted to another place and this time he voluntarily removed his clothes in order to be stripped searched, rather than have them cut off of him. At 19:50 on the DVD, Plaintiff was asked whether he required medical attention at that time, and Plaintiff responded yes he did. The Defendants removed the spit hood so that the nurse could examine Plaintiff and treat him. The nurse approached Plaintiff and washed his eyes out with a saline solution. DVD

at 20:21.   Plaintiff can also be heard to complain that his neck is killing him and his neck is stiff. The nurse indicates that Plaintiff is moving the neck o.k.   The spit hood is replaced and Plaintiff was then placed in a mobile restraint chair and strapped in and moved to the new strip cell. DVD at 21:22 et seq.   Plaintiff arrives at the point where they remove him from the restraint chair. The spit hood is removed and the nurse takes pictures of Plaintiff's face.   DVD at 25:26. Plaintiff is then taken to the cell, placed in a kneeling position in order to remove the leg irons safely, DVD at 27:23,   Plaintiff is then placed in the cell, and he places his hands through the wicket to have the handcuffs removed and they are removed and the door is locked and Plaintiff is recorded washing his face in the sink, DVD at 29:09, and drying his face with what appears to be toilet paper.   DVD at 30:20.  Again a medical report was prepared by the nurse who treated Plaintiff during the incident.   Under the space for "Initial Impression Illness/Injury," the nurse wrote: "when eyes were being flushed i/m [i.e., inmate] was moving head s̄ [11]complications noted. No other injuries were noted. I/M tolerated flusing of eyes [with] saline s̄ complications." Dkt. [90-4].

No reasonable jury viewing the evidence of the video tape and the medical evidence could find that excessive force was used.   Accordingly, the Defendants are entitled to summary judgement as to the claims for the April 7, 2005 use of force contained at Dkt. [64] at p. 31, ¶ 20

---

[11]   The Court takes judicial notice of the fact that in nursing shorthand, an "s" with a line above it means "without".

http://wiki.answers.com/Q/In_nursing_was_is_the_abbreviation_for_without

See also

http://answers.yahoo.com/question/index?qid=20081013132546AAOVS4Y

to p. 40, ¶ 21.

Plaintiff claims yet another instance of excessive force, which fares no better than the last two. Plaintiff was issued a misconduct for refusing to be patted down after coming out of the RHU law library and had pulled away from the escorting officers, Wilcher and Ferrier, and turned toward Ferrier in an aggressive manner and that this precipitated the need for Plaintiff to be forced up against the wall in order to gain control of him and that he was then led to a strip cell without incident. See Dkt. [90-3] at 2 to 35; Dkt. [90-4] at 67 to 68.

In his complaint, Plaintiff asserted that on April 5, 2005, Defendant Ferrier, while Plaintiff was being escorted from the RHU law library to return to his RHU cell, "assaulted Plaintiff by grabbing Plaintiff's upper right bicep extremely tightly seizing Plaintiff brutally in the process then painfully and unnecessarily squeezing Plaintiff's upper right bicep vehemently." Dkt. [64] at 23. Plaintiff then alleged that Defendant Ferrier's "already painful grasp tightened with greater vehemence; digging his . . . fingers into the flesh of Plaintiff'[s] upper right bicep as he flung Plaintiff backwards and forwards, to and fro, with a startling forceful vehemence." Id., at 24. Plaintiff concedes in his complaint that he "tried feebly and unsuccessfully to pull away from CO 1 Ferrier's painful grasp." Id. Plaintiff also claims that Defendant Ferrier slammed Plaintiff face first into the wall and that Ferrier struck Plaintiff with "his fisted right hand punching Plaintiff's face, landing a heavy vehement painful punch causing Plaintiff momentary disorientation through the concussion CO 1 Ferrier inflicted." Id.[12]

---

[12] In contrast to the complaint, in his grievance regarding this alleged incident, Plaintiff wrote as follows:

On 4-5-05 while walking back to my cell from law library and [Ferrier] slammed

(continued...)

30

Due to the unplanned use of force by Ferrier, the nurse was called and she examined Plaintiff. Again, a medical report was filled out by the nurse who indicated that there were "no visible injuries noted" and further, in the space on the form for type of injury, the Nurse indicated "None." The Nurse further indicated that "ROM [i.e.., range of motion] same as prior to incident. Walking [and] moving upper extremities without difficulty. No tx [i.e., treatment] needed at this time." Id. Plaintiff was placed on sick call the following day.

Viewing this evidence in light of the whole record, the Court has no hesitancy in concluding that the Defendants' motion for summary judgment concerning this incident of alleged excessive force should be granted. Plaintiff's allegations concerning the force supposedly used by Defendant Ferrier, including the alleged punch in the face that caused Plaintiff momentary disorientation should have left a mark. No mark was left. The alleged digging of Defendant Ferrier's fingers into Plaintiff's flesh should have left a mark. No mark was left. It is clear from the record that Plaintiff's version of the events is contradicted by the objective medical evidence documented contemporaneously with the event, not to mention all the other evidence of record. For "where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita, 475 U.S. at 587. As a corollary of this principle from Matsushita, while it is generally true that on summary judgment motions a court should not resolve credibility issues, nevertheless, where the

---

[12](...continued)
against the wall and told ["]you better do anything I damn well say or else." I asked him why he was so angry with me for not spreading my buttocks and he told me to shut up then pat searched me grabbing my testicles and buttocks pointedly. I complained and was punched in the face by C/O Ferrier then put into a hard cell.

Dkt. [90-3] at 9 to 10.

evidence adduced by a party is so incredible that reasonable minds could not believe it, the court

is not barred from entering summary judgment based on such a record. Kreimer v. Bureau of

Police for Town of Morristown, 958 F.2d 1242, 1250 (3d Cir. 1992) ("[w]hile summary

judgment may be based upon affidavits, conflicts of credibility should not be resolved on a

hearing on the motion for summary judgment **unless** the opponent's evidence is 'too incredible to

be believed by reasonable minds.'")(emphasis added)(quoting Losch v. Borough of Parkesburg,

736 F.2d 903, 909 (3d Cir. 1984)). In light of the objective medical evidence viewed in light of

the entire record concerning this incident, no reasonable jury could find for Plaintiff on his

alleged excessive force claim.

In the alternative, even if the force as described by Plaintiff were used, it is undisputed

that Plaintiff refused to submit to a pat search and that he attempted to pull away from CO

Ferrier. Officer Ferrier could have reasonably believed that such actions required some use of

force and so Defendant Ferrier used force, even if, in the heat of the moment, the force used by

Defendant Ferrier was not the least required to subdue Plaintiff. Hence, Officer Ferrier would be

entitled to qualified good faith immunity for such use of force for it would not have been clear to

a reasonable officer in the shoes of Officer Ferrier that use of force as described by Plaintiff in

response to Plaintiff's actions violated clear constitutional requirements.[13]

Next, we consider Plaintiff's claims contained in Dkt. [64] at ¶15, and find that they fail

to state a claim and should be dismissed as such. Plaintiff complains that Defendant Matthews

---

[13] Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009)("qualified immunity . . . shields Government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights'")(quoting, Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

filed a false misconduct against Plaintiff for his actions on April 5, 2005.  The evidence of record

shows in fact that the misconduct was not false despite one of the charges not being upheld.  In

any event, the filing of a false misconduct report violates none of Plaintiff's rights.  For

the general rule, as stated in Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir.1986)
provides that:

> [A] prison inmate has no constitutionally guaranteed
> immunity from being falsely or wrongly accused of conduct which
> may result in the deprivation of a protected liberty interest. The
> plaintiff, as all other prison inmates, has the right not to be
> deprived of a protected liberty interest without due process of law.

Thus, where a prisoner is provided due process, no constitutional violation
results from his being falsely accused of misconduct. Because Munson was
provided a due process hearing for each charge of misconduct, his constitutional
rights were not violated and he may not maintain a Section 1983 claim for the
alleged false misconduct reports.

Munson v. Burson, 210 F.3d 372 (Table), 2000 WL 377038, at *3 -*4 (6th Cir. April 17, 2000).[14]

Because Plaintiff received a misconduct hearing, at which one of the misconduct charges was

dismissed, Plaintiff's claim of false misconduct fails to state a claim and must be dismissed as

---

[14]  Accord  Ellis v. Peters, 21 F.3d 430 (Table), 1994 WL 117987, at *5 (7th Cir. 1994)
("Even assuming that the defendants did fabricate disciplinary reports against the plaintiff, he has
no federal cause of action.  Allegations of false disciplinary reports do not state a Fourteenth
Amendment claim where due process is afforded. Hanrahan v. Lane, 747 F.2d 1137, 1140 (7th Cir.
1984). The Seventh Circuit Court of Appeals has reasoned that the due process safeguards
associated with prison disciplinary proceedings are sufficient to guard against potential abuses.");
Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989); Allah v. California, 182 F.3d 924 (Table),
1999 WL 273413, at *1 (9th Cir. 1999)("Likewise, the district court properly dismissed Allah's
claim that two disciplinary reports filed against him by prison officials were based on false
information because Allah received hearings on both reports. See Freeman v. Rideout, 808 F.2d
949, 951 (2d Cir.1986) (allegation that filing a false disciplinary charge against an inmate is not
actionable under § 1983 where procedural due process protections are provided)."); Northington v.
McGoff, 968 F.2d 20 (Table), 1992 WL 149918 (10th Cir. 1992); Urbanski v. Horn, No. Civ. A. 97-
4647, 1998 WL 661531, at *4-*5 (E.D. Pa. Sept. 25, 1998) (collecting cases from the Eastern
District).

such.  Hence, the claims contained in Dkt. [64] at 15 to 17, ¶15 must be dismissed.[15]

In addition, to the extent that Plaintiff claims harassment, intimidation and ridicule at the hands of Defendants Gagnon and Stephens in ¶ 16, again such fails to state a claim under  Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and must be dismissed as such.[16]

In the alternative, the Defendants have provided all of Plaintiff's written grievances for the time period from February 15, 2005 to April 19, 2005 (except Grievance No. 112732, which was missing) and none of those grievances concerns these claims of alleged harassment from defendants Gagnon and Stephens and, so, the claims are unexhausted and/or procedurally defaulted.   To the extent that Plaintiff would point to Grievance No. 112732 as having raised such claims, because it is undisputed that only a first level grievance was filed, i.e., all three levels of that Grievance were not exhausted and, so, Plaintiff has procedurally defaulted any claims contained therein.  This same reasoning regarding the failure to exhaust/procedural default applies equally to Plaintiff's claims found in Dkt. [64] at 17 to 18, ¶ 17, wherein Plaintiff claims that Defendant Ferrier called Plaintiff a snitch on or about February 28, 2005, allegedly in retaliation for Plaintiff testifying way back in March 2003, Dkt. [90-2] at 3, in an unspecified lawsuit against Defendant Ferrier brought by another inmate.

---

[15]  Plaintiff also claims Defendant Ferrier gave Plaintiff a false misconduct in retaliation after the April 7, 2005 cell extraction.   Plaintiff is incorrect because Defendant Ferrier did not give Plaintiff a misconduct, a non party Corrections Officer by the name of Miller gave Plaintiff the misconduct.  Dkt. [90-4] at 38.  To the extent that Plaintiff claims C/O Miller gave Plaintiff the allegedly false misconduct, the same analysis as just provided in the text applies.  Plaintiff had a misconduct hearing thereafter and was found guilty of the misconducts. Dkt. [90-4] at 72.  Hence, the Defendants are entitled to summary judgment as to these claims.  Dkt. [64] at 28.

[16]  Given that Plaintiff has already twice amended his complaint, we find that any further attempted amendment would be futile.

We will briefly address now some of Plaintiff's minor claims. Plaintiff claims individual defendants failed to protect him from excessive force being used against him. As we have found that no reasonable jury could find for Plaintiff on an excessive force claim, then, *a fortiori*, no duty arose on the part of any defendant to protect Plaintiff from any such non-existent excessive force.

Plaintiff also claims that Defendant Ferrier harassed Plaintiff by making Plaintiff undergo strip searches. Defendants are entitled to summary judgment because they have shown that whenever Plaintiff moves into or out of the RHU cell, he is subject to being searched, even strip searched, given the heightened security concerns in the RHU. See, e.g., Dkt. [91] at 20 to 21. See also Dkt. [90-4] at 48 (Inmate Handbook for RHU inmates providing mandatory procedures for exiting the cell and requiring that an inmate be strip searched every time he leaves his cell). This is true notwithstanding Plaintiff's arguments that in at least one instance he refused to be strip searched in order to come out of the RHU law library and that the Handbook only requires that he be strip searched upon leaving his cell not returning to his cell from the RHU Law Library. Plaintiff reads the Handbook too narrowly and his arguments ignore the legitimate peonological interests in requiring any inmate, especially one deemed to be particularly troublesome, to undergo strip searches more frequently than is required in the Handbook. In other words, the Handbook does not direct when a strip search is **not** permitted but only states when a strip search is required. Indeed, it is difficult to imagine that any written set of procedures could cover all instances in a prison setting such as the RHU and that is where the exercise of informed discretion by corrections officers comes into play. Because there is no genuine issue of fact that Plaintiff was required to be stripped searched, that Plaintiff complains

35

Defendant Ferrier stripped searched Plaintiff too frequently is, on this record, of no constitutional moment.

Accordingly, for the above-stated reasons, the Defendants are entitled to summary judgment on all of Plaintiff's claims.

III.    Conclusion

Pursuant to the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules, the parties are allowed to file objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation, a copy of which docket entry is being mailed to Plaintiff along with the Report.  Failure to timely file objections may constitute a waiver of any appellate rights.  Any party opposing objections may file their response to the objections in accordance with Local Civil Rule 72.D.2.

Respectfully submitted,


/s/ *Amy Reynolds Hay*
Chief United States Magistrate Judge

Dated: 2 June, 2010


cc:     Nora Barry Fischer
        United States District Judge

        Nathaniel L. Adderly
        DC-8452
        SCI Frackville
        1111 Altamount Blvd.
        Frackville, PA 17931-2699

        Mariah Passarelli
        via CM/ECF